**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ayden Daurio, | No. CV-25-00001-PHX-SPL |
| Plaintiff, | |
| vs. | **ORDER** |
| State of Arizona, et al., | |
| Defendants. | |

Before the Court is Defendants' Motion to Dismiss (Doc. 6), Plaintiff's Response (Doc. 9), and Defendants' Reply (Doc. 10). For the following reasons, the Court will grant Defendants' Motion in part and deny the Motion in part.[1]

## I.     **BACKGROUND**

This case ("*Daurio* II") relates to another action in this District, *Daurio v. Arizona Department of Child Safety, et al.*, No. CV-18-03299-PHX-GMS ("*Daurio* I"). The plaintiff in *Daurio* I, Steven Daurio ("Father"), is the father of the current Plaintiff, Ayden Daurio. *Daurio* I arose out of the same Department of Child Safety ("DCS") investigation and subsequent proceedings as the case at hand. *See Daurio v. Arizona Dep't of Child Safety*, No. CV-18-03299-PHX-GMS, 2020 WL 6940812 (D. Ariz. Nov. 25, 2020), *aff'd sub nom. Daurio v. Faust*, No. 22-15248, 2023 WL 6803553 (9th Cir. Oct. 16, 2023).

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

The DCS investigation at issue in both *Daurio* I and *Daurio* II began on August 5, 2016, when Plaintiff Ayden Daurio, then a minor, reported to his school principal that his father, Steven Daurio, "had hit him with a pool skimmer pole." (Doc. 1-2 ¶¶ 16–17). When Plaintiff returned to school on Monday, he was interviewed by DCS criminal conduct investigator Jamie Jenkins ("Jenkins."). (*Id.* ¶ 21). Jenkins "performed a global assessment of Ayden and found him healthy and free of injuries, marks, or bruises" and "reported that Ayden indicated he 'felt safe' with both of his parents." (*Id.* ¶ 22). Having determined that Ayden was "safe," Jenkins closed the DCS investigation the following day pending supervisory approval. (*Id.* ¶¶ 23–24). Plaintiff continued to stay with his father from August 5 through August 10, 2016, and his father was unaware of the investigation. (*Id.* ¶ 25).

However, on August 10, a different DCS caseworker, Defendant Reynolds, met with Plaintiff's mother and thereafter began "documenting a plan to remove Ayden from Father's custody." (*Id.* ¶¶ 26–27). Reynolds and her supervisor, Defendant Passmore, jointly prepared a TDM ("Team Decision Meeting") Referral form to request a formal TDM. (*Id.* ¶¶ 28–30). Plaintiff alleges that Reynolds and Passmore made two false entries on the TDM Referral form: (1) they falsely noted on the form that the TDM was part of an ongoing joint criminal investigation when "[n]o criminal investigation was ongoing," and (2) they falsely noted on the form that law enforcement had instructed DCS not to talk to Plaintiff's father due to this nonexistent "ongoing criminal investigation." (*Id.* ¶¶ 32–34).

On August 12, 2016, the TDM was attended by Plaintiff's mother, her husband, her nanny, Reynolds, and Passmore. (*Id.* ¶ 36–37). Plaintiff's father was given no notice of the meeting and was "deliberately excluded," as were Father's family, Plaintiff's counselor, neighbors, Plaintiff's attorney, and Jenkins, who had written the initial report finding Plaintiff "safe" and without bruises. (*Id.* ¶¶ 38–39). After the TDM, Reynolds and Passmore created a TDM Summary report "with DCS' official position that Ayden needed to be removed from Father's custody." (*Id.* ¶ 41).[2] Plaintiff alleges that numerous

_____

[2] To extent Plaintiff believes the TDM Summary report attached to Defendants' Motion should be sealed (Doc. 9 at 4 n.1), Plaintiff may file a Motion to Seal with his legal

knowingly false statements were included in the TDM Summary, including false indications that there were "concerns that there are current allegations against [Father] by the previous nanny and mother for sexual abuse, domestic violence, substance abuse, and physical abuse," and a false indication that Plaintiff had been with his mother since the incident and was afraid to return to his father. (*Id.* ¶¶ 42–45).

Reynolds and Passmore then "provided the TDM Summary to Mother" and allegedly "directed Mother to file a Petition for Order of Protection in her ongoing Family Court case" using the TDM Summary. (*Id.* ¶¶ 47–48). She followed their directions and was granted an *ex parte* Petition for Order of Protection on August 15, 2016, after which Plaintiff's father was barred from making any contact with him. (*Id.* ¶¶ 51–54). She then filed a Petition to Modify Legal Decision Making, Parenting Time, and Child Support, after which Plaintiff's father's parenting time was suspended. (*Id.* ¶¶ 55–56). Plaintiff only saw his father "during a 1 hour counseling session, at a truancy hearing, and once for 5 minutes" over the following ten months. (*Id.* ¶ 57).

"Two months after Father's parenting time had been suspended Reynolds and Passmore finally scheduled Father [an] interview regarding the August allegation." (*Id.* ¶ 58). However, Reynolds and Passmore did not allow Father's counsel to sit with him during his interview, did not investigate any of the exculpatory evidence provided by Father's counsel, did not place that letter or its exhibits into DCS's files, did not interview any of his exculpatory witnesses, closed and completed the DCS investigation three days after Father's interview, deleted Father's mailing address from the DCS system so only Mother would receive any future DCS correspondence, and failed to send Father a required Notice of Proposed Substantiation of the child abuse findings through which he could challenge the proposed findings. (*Id.* ¶¶ 59–77). Plaintiff's father only learned about the Notice of Proposed Substantiation at a May 9, 2017 Family Court custody hearing and ultimately

---

argument on the matter after meeting and conferring with Defendants about whether the issue can be resolved without this Court's intervention. However, this Court also notes that the report is currently unsealed in *Daurio* I. (*See* Doc. 94-3 in *Daurio v. Arizona Dep't of Child Safety*, No. CV-18-03299-PHX-GMS).

received the letter in June, after which he "spent the balance of the summer trying to get DCS to reconsider the substantiation of the abuse allegation." (*Id.* ¶¶ 80–84). Senior DCS officials ultimately reversed and removed the substantiation finding, allowing Plaintiff's father to pursue reversal of the custody orders. (*Id.* ¶¶ 85–86).

The Family Court held an evidentiary hearing on November 28, 2018 on all the matters arising out of the DCS investigation, and it issued orders (1) granting Father sole legal decision-making authority for Plaintiff, (2) finding that unrestricted parenting time with Mother would harm Plaintiff's mental, moral, and/or emotional health, (3) restricting Mother's parenting time and ordering that Plaintiff reside with Father and have no contact with Mother for 30 days, (4) finding no evidence in the DCS file indicating observed injuries to Plaintiff, and (5) finding that Plaintiff's father did not commit an act of child abuse. (*Id.* ¶ 87). In sum, Plaintiff contends that the State Defendants violated state laws and DCS policies intended to protect familial relationships, unnecessarily delayed resolution of Family Court litigation, deprived Plaintiff of 15 months of time with his father, and prevented his father from protecting Plaintiff from his mother's neglect. (*Id.* ¶¶ 88–92).

## II.    <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" so that the defendant is given fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). A court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) for two reasons: (1) lack of a cognizable legal theory, or (2) insufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When deciding a motion to dismiss, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III. DISCUSSION

#### A. Claim Preclusion

Defendants first argue that the prior lawsuit (*Daurio* I) "undeniably bars the current Complaint" under the doctrine of res judicata. (Doc. 6 at 5). "Under res judicata (claim preclusion), a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in a prior action." *Tug Constr., LLC v. Harley Marine Fin., LLC*, 412 F. Supp. 3d 1293, 1301 (W.D. Wash. 2019) (citing *In re Imperial Corp. of Am.*, 92 F.3d 1503, 1506 (9th Cir. 1996)). A party must establish three elements to utilize this defense: "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003). Defendants argue (1) that *Daurio* I and II share a common identity of claims because the two suits arise out of the same transactional nucleus of facts, (2) that *Daurio* I was adjudicated on the merits, and (3) that the parties are in privity because the plaintiffs in both cases "have a sufficient commonality of interest to implicate res judicata." (Doc. 6 at 5–6).

The Court need not waste too much time on Defendants' claim preclusion argument because Defendants have failed to establish privity between the plaintiffs in *Daurio* I and *Daurio* II.[3] As Plaintiff points out, none of the recognized exceptions to the rule against nonparty claim preclusion have been established by Defendants here, as Plaintiff "had no agreement to be bound by his father's case," "had no substantive legal relationship with his father," "was not adequately represented" by his father in the prior case, "did not control his father's litigation," is not bringing suit as a designated representative, and is not involved in a special statutory scheme. (Doc. 9 at 3 (citing *Taylor v. Sturgell*, 553 U.S. 880, 893–96 (2008))); *see also Fox v. MHM Health Pros. LLC*, No. CV-23-00190-PHX-DWL, 2024 WL 4364133, at *7 (D. Ariz. Sept. 30, 2024) ("The party seeking preclusion has the

---

[3] The Court also notes that in their Reply (Doc. 10), Defendants fail to respond to any of Plaintiff's counterarguments regarding claim preclusion. In fact, claim preclusion is not mentioned at all in the Reply.

burden of establishing the necessary elements." (citing *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021 (9th Cir. 2019))). The mere fact that the plaintiffs in *Daurio* I and *Daurio* II are father and son, and their cases arise out of the same DCS investigation, is not enough, as "[f]amilial relationship does not necessarily result in privity," *Evans v. Gilmore*, No. 15-cv-01772-MEJ, 2015 U.S. Dist. LEXIS 94995, at *12 (N.D. Cal. July 21, 2015), and Defendants have provided no on-point case law to support their argument that Plaintiff and his father are in privity here. Accordingly, Defendants' res judicata argument must fail.

### B.    Judicial Deception

Plaintiff's first count in the Complaint is for Judicial Deception in violation of 42 U.S.C. § 1983 against Defendants Reynolds and Passmore in their individual capacities. (Doc. 1-2 ¶¶ 93–102). There is "a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1146 (9th Cir. 2021).

As a preliminary matter, Defendants argue that Reynolds and Passmore are entitled to qualified immunity for the judicial deception claim because it is based on the same operative facts as the familial interference claim in *Daurio* I, where the district court held, and the Ninth Circuit affirmed, that Defendants were entitled to qualified immunity. *See Daurio v. Faust*, No. 22-15248, 2023 WL 6803553 (9th Cir. Oct. 16, 2023).

As the Ninth Circuit has explained,

> Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct. A government official violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although there need not be a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate.

*Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (internal citations and quotation marks omitted).

In *David v. Kaulukukui*, 38 F.4th 792 (9th Cir. 2022), the Ninth Circuit observed that "caselaw clearly establishes that, as part of the right to familial association, parents and children have a 'right to be free from judicial deception' in child custody proceedings and removal orders." *Id.* at 800; *see also Benavidez*, 993 F.3d at 1152 ("[M]aterial omissions and misrepresentations with a deliberate disregard for the truth to a juvenile court would violate the Constitution."); *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1119 (9th Cir. 2017) ("[T]he knowing use of false evidence [is] absolutely and obviously irreconcilable with the Fourteenth Amendment's guarantee of Due Process in our courts."). In *Kaulukukui*, the plaintiff alleged that if a family court judge had been informed of a relevant custody order that had been omitted from a petition for protective order, the protective order never would have been granted. The district court denied a motion to dismiss the plaintiff's § 1983 claim for violating the constitutional right to familial association, finding that the police department employee being sued was not entitled to qualified immunity. The Ninth Circuit affirmed. *See generally id.*

Here, the Court finds that Plaintiff has pled facts showing that Defendants violated a clearly established constitutional right. Accordingly, they are not entitled to qualified immunity for the judicial deception claim. The Court will therefore proceed with analyzing whether the judicial deception claim is adequately pled under the Rule 12(b)(6) standard.

"To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding . . . ." *Benavidez*, 993 F.3d at 1146 (quoting *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004)). "A plaintiff who provides direct evidence of false statements can allege deliberate fabrication of evidence in violation of constitutional due process guarantees." *Id.* "To successfully allege a violation of the constitutional right to be free from judicial deception, the [plaintiff] must make out a claim that includes (1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the

truth, that was (3) material to the judicial decision." *Id.* at 1147. Defendants contend that Plaintiff has failed to state a claim for judicial deception because (1) the statements in the TDM Summary are not false, (2) the perceived false statements were not material, (3) the TDM Summary was not drafted by the State Defendants, and (4) Plaintiff's mother, not Reynolds and Passmore, provided the TDM Summary to the Family Court. (Doc. 6 at 8–12).

### 1.    Misrepresentations or Omissions

Plaintiff has adequately pled that Defendants made false statements in the TDM Summary. Plaintiff alleges the following false statements and omissions:

(1) "In the TDM Summary Reynolds and Passmore falsely indicated that there were 'concerns that there are current allegations against [Father] by the previous nanny and mother for sexual abuse, domestic violence, substance abuse, and physical abuse.' Reynolds and Passmore knew this entry was false because as the DCS file reflected, there were no current allegations and all prior allegations had been found to be unsubstantiated." (Doc. 1-2 ¶ 43).

(2) "In the TDM Summary Reynolds and Passmore falsely indicated that Ayden had been with Mother 'since the incident and was afraid to return to [Father].' Reynolds and Passmore knew this was false because the DCS investigation itself reflected that Ayden was in Father's custody . . . for all but two days since the alleged incident." (*Id.* ¶ 44).

(3) "In the TDM Summary Reynolds and Passmore falsely indicated that Ayden was afraid to return to father. Reynolds and Passmore knew this was false because the DCS file reflected . . . [that] Ayden told Investigator Jenkins that he felt safe with Father" (*Id.* ¶ 45).

(4) "Reynolds and Passmore also omitted all the information that Father would have submitted had defendants provided him with notice of the

8

1      TDM." (*Id.* ¶ 46).

2          As to the first statement, Defendants argue that this cannot be a false statement

3      because it merely expresses "concerns" about allegations, and "a concern cannot be false

4      statement." (Doc. 6 at 9). Furthermore, they argue that "it is undeniable that being struck

5      with a pool skimmer pole as reported constitutes physical abuse." (*Id.*). The Court agrees

6      that these "concerns," based on both the pool skimmer allegation and allegations by the

7      mother and nanny during the TDM, cannot constitute a false statement, and as such, cannot

8      give rise to a judicial deception claim.

9          However, taking all material facts in the Complaint as true and construing them in

10     the light most favorable to Plaintiff, the second and third statements are false statements

11     for purposes of a judicial deception claim. The claims that Plaintiff was with his mother

12     since the incident and was afraid to return to his father are belied by Plaintiff's well-pleaded

13     allegations that (1) the investigative report from Jenkins indicated that Plaintiff "felt safe"

14     with both of his parents, including his father, and (2) Plaintiff stayed with his father from

15     August 5 through August 10, 2016, which were the days following the incident. (Doc. 1-2

16     ¶¶ 20–25).

17         Furthermore, Plaintiff describes numerous pieces of exculpatory evidence that, had

18     Father been allowed to attend the TDM, he would have been able to present and would

19     have been included in the TDM Summary. (Doc. 9 at 6–7). It is not clear how Defendants

20     could have "omitted" specifically exculpatory evidence that they were not aware of at the

21     time, as Father had no opportunity to present it to them. However, they certainly knew they

22     were omitting Father's perspective on the incident in its entirety. Plaintiff also alleges that

23     Defendants falsely indicated that they did not speak to Father due to an ongoing criminal

24     investigation despite (1) knowing that there was no ongoing criminal investigation and (2)

25     having no contact with law enforcement before preparing the form. (Doc. 1-2 ¶¶ 33–36).

26     This could constitute an omission giving rise to a claim for judicial deception.

27             **2.      Made Deliberately or With Reckless Disregard for Truth**

28         Next, the Court must determine whether the false statements and omissions were

made deliberately or with reckless disregard for the truth. Plaintiff has alleged facts in support of this element, given that Defendants would have known the exculpatory contents of Jenkins' investigative report, they knew there was no criminal investigation ongoing, and they knew they were excluding Father from the TDM. Furthermore, Plaintiff alleges facts regarding a deliberate "plan" devised by Reynolds and Mother to remove Plaintiff from Father's custody. (*Id.* ¶¶ 26–29). These facts, if true, give rise to a finding that the false statements and omissions were made deliberately or with a reckless disregard for the truth.

### 3.    Material to Judicial Decision

Defendants argue that "[e]ven if the second and third statements were untrue and deliberately misrepresented in the TDM Summary," they were not material to the Family Court's decision to issue an Order of Protection on August 15, 2016. (Doc. 6 at 10). According to Defendants, even eliminating the allegedly false statements from the Family Court's consideration, "the Court is still left with the fact that the minor reported to school officials that Father struck him with a pool skimmer pole and that the incident left visible marks and bruises visible days later. This fact alone is sufficient for the order of protection to issue." (*Id.* (citation omitted)). However, because this report was belied by Jenkins' investigative report, which found Plaintiff free of injuries or marks, reported that he "felt safe" with his parents, and determined that he was safe, it is not clear that the Family Court would have issued the *ex parte* Order of Protection but for the false statements and omissions. (Doc. 1-2 ¶¶ 22–23). Defendants' reliance on *Wright v. Southern Arizona Children's Advocacy Center*, No. CV-21-00257-TUC-JGZ, 2024 WL 4277877 (D. Ariz. Sept. 24, 2024), is inapposite. In that case, which was at the summary judgment stage, the court found that alleged false statements were immaterial to a court's decision to grant temporary custody of a child to DCS because the facts showed that the child "has stated he was hit with objects and had marks on his body from discipline." *Id.* at *9. The *source* of the marks was disputed, but it was undisputed that the child had bruises on his body. Here, however, Jenkins' report indicated that there were *no* marks or bruises on Plaintiff.

Furthermore, the child in *Wright* reported during the initial investigation that his stepmother regularly used physical discipline on him, whereas during Jenkins' investigation, Plaintiff stated that he "felt safe" with his parents. *Id.* at *7; (Doc. 1-2 ¶ 22). Additionally, even assuming the Family Court placed significant weight on the initial report that Plaintiff was struck with a pool skimmer pole and had visible marks and bruises, had Defendants not excluded Father from the TDM, the exculpatory evidence he could have presented (e.g., a photo of Plaintiff smiling after getting out of the pool, and an affidavit from his babysitter that they had been wrestling in the pool) may have also weighed against issuance of the protection order. (Doc. 1-2 ¶ 65). It is difficult to determine what the Family Court would or would not have done in the absence of the alleged false statements or omissions; however, construing the facts in a light most favorable to Plaintiff, it is certainly plausible that but for those false statements or omissions, the *ex parte* protection order would not have been issued.

Defendants' ancillary argument that there is no evidence that Reynolds and Passmore, as opposed to a TDM Facilitator, drafted the TDM Summary is also unavailing—as Defendants themselves acknowledge, at this stage, Plaintiff's well-pleaded factual allegations must be construed as true. (Doc. 6 at 11). And regardless of the fact that Mother, not Reynolds and Passmore, provided the TDM Summary to the Family Court, assuming it is true that Reynolds and Passmore made materially false statements in the TDM Summary, and that the Family Court relied on these statements and omissions, Plaintiff's judicial deception claim must move forward.

### C.    Gross Negligence

Plaintiff's second claim is for Gross Negligence against the State of Arizona. (Doc. 1-2 ¶¶ 103–08). He argues that the State is responsible and liable for Reynolds and Passmore's "gross, willful or wanton conduct in violation of Arizona statutes, and DCS policies and procedures" under *respondeat superior*. (*Id.*). Defendants argue that this claim must fail for four reasons: (1) Plaintiff failed to allege that he suffered bodily harm, (2) Defendants owed no duty to Plaintiff, (3) no tort for negligent investigation exists, and (4)

Plaintiff has no right to a reasonable investigation. (Doc. 6 at 13–16).

"A party is grossly negligent if they know, or have reason to know, facts that would lead a reasonable person to recognize their conduct created an unreasonable risk of bodily harm and involved a high probability of substantial harm." *Garibay v. Johnson in & for Cnty. of Pima*, 565 P.3d 236, 246 (Ariz. 2025). As another court in this District has observed, "[i]n most Arizona cases . . . courts have written that gross negligence must involve an unreasonable risk of 'bodily harm.' Some Arizona cases remove the 'bodily harm' language from the rule statement, but most of these cases still involve bodily harm." *Danishek v. United States*, No. CV-23-08131-PCT-JJT, 2024 WL 4870497, at *4 n.2 (D. Ariz. Nov. 22, 2024) (citation omitted). Plaintiff argues that "a gross negligence claim does not require an allegation of bodily harm," but merely a showing of "gross, willful, or wanton conduct." (Doc. 9 at 8). While it is true that the gross negligence standard only requires that a defendant's conduct create an unreasonable *risk* of bodily harm, and a plaintiff need not show that actual bodily harm occurred, it is not true that this "risk of bodily harm" requirement is dispensable when making a claim for gross negligence, and neither of the cases Plaintiff cites support such a proposition. *Noriega* cites *both* the "bodily harm" standard and the more general "gross, willful, or wanton conduct" standard. *See Noriega v. Town of Miami*, 407 P.3d 92, 100 (Ariz. Ct. App. 2017). And *Roebuck* was a medical negligence case where the plaintiff *did* suffer bodily harm. *See Roebuck v. Mayo Clinic*, 536 P.3d 289, 296 (Ariz. Ct. App. 2023), *review granted in part* (Sept. 10, 2024). It is not clear that Arizona courts have dispensed with the "bodily harm" requirement in relation to gross negligence claims, and the Court is not aware of any cases, nor does Plaintiff cite any cases, where it has done so. *See Jonovich as trustee of Daniel & Olive Darlene Jonovich Tr. v. City of Globe*, No. 2 CA-CV 2023-0136, 2023 WL 8086753, at *3 (Ariz. Ct. App. Nov. 21, 2023), *review denied* (May 7, 2024) ("[Plaintiffs] alleged only monetary damages not bodily harm, and they have cited no authority that a gross negligence claim can be maintained absent a risk of physical harm."); *Arimilli v. Rezendes*, No. CV-21-00345-PHX-GMS, 2022 WL 1664278, at *3 (D. Ariz. May 25, 2022) ("[T]he

1    Court is unaware of any cases supporting Plaintiff's proposition that gross negligence
2    under Arizona law encompasses financial harm as well as bodily harm. Second, to the
3    extent Plaintiff argues her emotional distress should be considered bodily harm for the
4    purposes of a gross negligence claim, her argument is not well taken. Even though
5    emotional distress may cause bodily harm, emotional distress itself is not a form of bodily
6    harm under Arizona law." (citation omitted)); *Valles v. Pima Cnty.*, 776 F. Supp. 2d 995,
7    1005 (D. Ariz. 2011), *aff'd sub nom. Valles v. Cnty. of Pima*, 502 F. App'x 651 (9th Cir.
8    2012) (granting summary judgment on a gross negligence claim where "Plaintiffs have not
9    alleged an unreasonable risk of bodily harm or presented a triable issue of fact that the
10   County created such a risk.").

11        None of the conduct alleged by Plaintiff in relation to the gross negligence claim—
12   directing Mother to file an intentionally false and misleading TDM Summary, deleting
13   Father's address in the DCS system, and failing to send Father a notice of proposed
14   substantiation of child abuse—meets the "bodily harm" standard required to state a claim
15   for gross negligence under Arizona law. Nor does Plaintiff try to argue that his claim *could*
16   meet this standard. Instead, Plaintiff merely emphasizes the "gross and willful" conduct of
17   Defendants that "delayed resolution of the custody matter and kept Plaintiff unnecessarily
18   separated from his father for [an] additional 5 months." (Doc. 9 at 8). Plaintiff's Complaint
19   states only that he suffered "damages and emotional distress." (Doc. 1-2 ¶ 108). Plaintiff's
20   pleading does not establish that Defendants knew, or had reason to know, "facts that would
21   lead a reasonable person to recognize their conduct created an unreasonable risk of bodily
22   harm and involved a high probability of substantial harm." *Garibay*, 565 P.3d at 246. And
23   having reviewed the detailed allegations set forth in the rest of Complaint, the Court does
24   not find that amendment could cure this defect. *See Schreiber Distrib. Co. v. Serv-Well*
25   *Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is dismissed for failure
26   to state a claim, leave to amend should be granted unless the court determines that the
27   allegation of other facts consistent with the challenged pleading could not possibly cure

28

13

1    the deficiency.").[4]

2        Because Plaintiff has not, and cannot, allege facts showing that Defendants knew or

3    should have known their conduct created an unreasonable risk of bodily harm to Plaintiff,

4    Plaintiff's gross negligence claim will be dismissed without leave to amend.

5              **D.    Intentional Infliction of Emotional Distress**

6        Finally, Plaintiff asserts a claim for Intentional Infliction of Emotional Distress

7    ("IIED") against the State of Arizona. (Doc. 1-2 ¶¶ 109–15). The elements of an IIED claim

8    under Arizona state law are: (1) "the conduct by the defendant must be 'extreme' and

9    'outrageous', (2) "the defendant must either intend to cause emotional distress or recklessly

10   disregard the near certainty that such distress will result from his conduct," and (3) "severe

11   emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon*,

12   Inc., 734 P.2d 580, 585 (Ariz. 1987). "Even if a defendant's conduct is unjustifiable, it does

13   not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency'

14   that would cause an average member of the community to believe it was 'outrageous.'"

15   *Nelson v. Phx. Resort Corp.*, 888 P.2d 1375, 1386 (Ariz. Ct. App. 1994) (quoting *Ford*,

16   734 P.2d at 585).

17       Here, Plaintiff alleges that Reynolds and Passmore engaged in "extreme and

18   outrageous conduct," and the State should be liable for their behavior under *respondeat

19   superior*. (Doc. 1-2 ¶¶ 110, 115). The outrageous conduct alleged includes, *inter alia*: (1)

20   excluding Father from the TDM and TDM Summary, (2) omitting Jenkins' report and

---

22   [4] Even if, for example, Plaintiff were to argue that Defendants' conduct led to him
23   remaining in his mother's sole custody for 15 months where he "missed 50 days of school
     and suffered other abuse and damages," there is no reason to think Defendants knew or
24   could have known that separating Plaintiff from his father would likely result in alleged
     abuse or neglect from his mother. (Doc. 1-2 ¶ 1). Although the Family Court ultimately
25   held that "unrestricted parenting time with Mother would harm Ayden's mental, moral
     and/or emotional health," no such finding had been made or order entered at the time
26   Defendants' alleged misconduct occurred. (*Id.* ¶ 87). The only relevant orders mentioned
     by Plaintiff that Defendants might have been aware of were previous "orders admonishing
27   Mother for keeping Ayden out of school for extended periods having been cited for truancy
     while in Mother's custody." (*Id.* ¶ 65). This is not sufficient to lead a reasonable person to
28   believe that leaving Plaintiff in his mother's custody created an unreasonable risk of bodily
     harm, especially where her custody had never been revoked before.

14

finding that Plaintiff was "safe" and had no bruising, (2) making material misrepresentations and omissions in the TDM Summary, and (3) failing to give Father timely notice of substantiation by changing his address in the DCS system. (*Id.* ¶ 110).

While the Court agrees that, as pled, this conduct is unjustifiable, it does not meet the high "extreme and outrageous" bar required to state an IIED claim. *See Macias v. Kaplan-Siekmann*, No. CV-22-00280-PHX-SPL, 2024 WL 83448, at *6 (D. Ariz. Jan. 8, 2024) (citing cases); *Watkins v. Arpaio*, 367 P.3d 72, 75 (Ariz. Ct. App. 2016) ("Claimants bear a heavy burden in establishing the type of extreme and outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress."). And even if the conduct could be considered extreme and outrageous, Plaintiff has not alleged, in a non-conclusory manner, that he suffered the requisite level of "severe" emotional distress required to establish the third element of an IIED claim. *See Harding v. Sternsher*, No. 1 CA-CV 16-0127, 2017 WL 3138184, at *3 (Ariz. Ct. App. July 25, 2017), *as amended on reconsideration* (Oct. 25, 2017) ("[C]rying, being stressed and upset, and having occasional trouble sleeping is not enough to establish severe emotional distress. On the other hand, anxiety that results in physical symptoms such as high blood pressure, a nervous tic, chest pains, fatigue and dizziness may constitute severe emotional distress." (citations omitted)).

The Court further finds that allowing Plaintiff to amend this claim would be futile, because although it is possible that he could plead additional facts showing severe emotional distress, it remains that Reynolds and Passmore's alleged conduct, though unjustifiable, does not rise to the level of "extreme and outrageous" conduct required to meet the first element of an IIED claim. Because this defect could not be cured by amendment, the claim will be dismissed without leave to amend.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. 6) is **granted in part and denied in part**. Plaintiff's claims for Gross Negligence (Count II) and Intentional

Infliction of Emotional Distress (Count III) against the State of Arizona are **dismissed without leave to amend**. Because all claims against it have now been dismissed, the State of Arizona shall be **dismissed** as a party to this case. However, the Motion to Dismiss is **denied** with respect to Plaintiff's claim for Judicial Deception in violation of 42 U.S.C. § 1983 against Defendants Reynolds and Passmore.

Dated this 24th day of June, 2025.

Honorable Steven P. Logan
United States District Judge